HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

395 LAMPE, LLC, et al.

    Plaintiffs, Counterclaim Defendants,

v.

KAWISH, LLC, et al.,

    Defendants, Counterclaim Plaintiffs, Third-Party Plaintiffs,

v.

WAYNE L. PRIM, et al.,

    Third-Party Defendants.

CASE NO. C12-1503RAJ

ORDER

## I. INTRODUCTION

The court issues the order in the wake of a two-and-a-half day evidentiary hearing that began on January 7. The court makes two primary rulings. First, 395 Lampe, LLC ("Lampe") has not yet effected a "disposition" of the one-third interest in Western Pacific Timber, LLC (the "Collateral WPT Interest") that it acquired on or about April 3, 2012. Second, to the extent it is at all relevant (and the court has little or no reason to believe that it is), the fair market value of the Collateral WPT Interest as of April 3, 2012 was $12.013 million.

The parties shall submit a joint statement in accordance with this order no later than February 6.

ORDER – 1

## II. BACKGROUND

Before explaining its primary rulings, the court places them in the context of this unusual litigation. The court will review the debtor-creditor relationship between the parties and the morass of litigation that has emerged from that relationship. It will consider the parties' representations that the evidentiary hearing they requested would serve as a substantial step toward ending that litigation, and explain the court's conviction that those representations are likely inaccurate. The court will then explain its two primary rulings. The order concludes with a mandate that the parties resolve this litigation, and that they do so much more efficiently than they have so far.

### A. The Blixseth Entities Default on Loans Secured by the Collateral WPT Interest.

Entities under the control of Wayne Prim loaned millions of dollars to Timothy Blixseth or entities under his control. For the sake of simplicity, the court will refer to the "Prim Entities" as the loans' creditor and the "Blixseth Entities" as the loans' debtor. Effective April 2008, Mr. Blixseth and Lampe (one of the Prim Entities) entered into a Membership Pledge Agreement ("MPA") in which Mr. Blixseth pledged the Collateral WPT Interest (his one-third interest in WPT) as security for a portion of those loans whose initial principal balance was $16 million.

WPT's primary assets are about 146,000 acres of timberland in Washington and Idaho. During the time the Prim Entities made most of the loans to the Blixseth Entities, WPT had three members with equal ownership interests: Mr. Blixseth, Kingsbury Timber, LLC ("Kingsbury"), and Voyager Group, LP ("Voyager"). Kingsbury is a Prim Entity; Voyager is not.

At the same time that Mr. Blixseth and Lampe entered the MPA, WPT's members executed consent minutes (the "Consent Minutes") that authorized Mr. Blixseth to grant Lampe the security interest reflected in the MPA. The Consent Minutes authorized any sale or other transfer of the Collateral WPT Interest in accordance with the MPA. The Consent Minutes acknowledged paragraphs 11.1 and 11.5 of the WPT operating

ORDER – 2

agreement, which prohibit most transfers of membership interests, but permit any transfer with the members' unanimous consent.

In 2009, Mr. Blixseth transferred the Collateral WPT Interest to one of his entities, Desert Ranch, LLLP ("Desert Ranch"). He made the transfer with the consent of Lampe and all members of WPT. Desert Ranch took the Interest subject to the MPA.

So far as the court is aware, no one disputes that the Blixseth Entities defaulted on the loans. On March 26, 2012, Lampe issued Desert Ranch a formal notice of default and of its intent to "transfer the [Collateral WPT Interest] into its name" if the default was not cured within five days. On April 6, Lampe notified Desert Ranch in writing that the Interest "ha[d] been transferred into 395 Lampe's name, effective as of April 3, 2012."

The Collateral WPT Interest has languished in Lampe's possession since April 2012. Meanwhile, litigation among the parties has flourished.

**B.    The Court Allows the Parties to Resolve The Bulk of Their Disputes in This Forum.**

To explain how the Blixseth Entities' default led to this month's evidentiary hearing, the court reviews the tortured history of the litigation between the parties.

The Prim Entities' efforts to seize collateral have not been limited to the Collateral WPT Interest. This suit, which began in King County Superior Court, was initially an effort to foreclose on a residential property that the Blixseth Entities own in Medina, Washington. The Prim Entities also filed two lawsuits in Nevada's state court arising out of Lampe's seizure of the Collateral WPT Interest, and another lawsuit in Montana's state courts seeking to foreclose on property that the Blixseth Entities owned (or asserted ownership of) in that state. The Blixseth Entities are also debtors in bankruptcy proceedings in several states, including Washington. This case was destined to become a part of bankruptcy proceedings that one of the Blixseth Entities instituted in this District's Bankruptcy Court, but that entity waived automatic reference to the bankruptcy

ORDER – 3

court by a series of procedural missteps. The court chronicled this morass of lawsuits in its February 13, 2013 order. Dkt. # 48.

In the months following the February 13 order, the parties dismissed the Nevada actions and took other steps to assure the court that they were not attempting to litigate the claims in this lawsuit in multiple forums. *See* Mar. 25, 2013 ord. (Dkt. # 55); Jun. 24, 2013 ord. (Dkt. # 71). The parties filed an amended complaint and counterclaims. The Prim Entities asserted seven causes of action against the Blixseth Entities. The Blixseth Entities responded with ten counterclaims and third-party claims.

## C. The Parties Focus on the Value of the Collateral WPT Interest, Even Though the Value is Relevant Only If Lampe Has Effected a Disposition of That Interest to Itself.

Despite their many claims, the parties assured the court in a May 20, 2013 joint status report that the "heart of this dispute is the defense espoused by [the Blixseth entities] that all debt has been satisfied and/or extinguished by a transfer of the [Collateral WPT Interest]." Dkt. # 69, ¶ 22. The parties claimed that resolving the dispute would "require" determinations of the value of the Collateral WPT Interest, whether a "disposition" of that Interest had already occurred, and whether the Prim Entities somehow waived "a deficiency or interest." *Id.* The parties also informed that court that if a "disposition" had not yet occurred, they would request that the court determine a commercially reasonable method to dispose of the Collateral WPT Interest and then determine the amount of any surplus or deficiency after that "disposition." *Id.* The parties first proposed that the court hold an evidentiary hearing "to determine the value of the WPT Membership Units and the method, if any, of the commercially reasonable disposition of the WPT Membership Units." *Id.* ¶ 23. The court demanded that the parties "explain precisely how the[y] propose to resolve the issues they have raised, whether by way of dispositive motion, a 'trial on the papers' procedure, by evidentiary hearing, or otherwise." Jun. 24, 2013 ord. (Dkt. # 71) at 2. The parties responded by requesting *only* an evidentiary hearing, and *only* to determine the value of the Collateral

ORDER – 4

WPT Interest. Jul. 12, 2013 joint status report (Dkt. # 73) ¶ 2. The court scheduled a January 7, 2014 evidentiary hearing.

Although the parties did not request leave to file dispositive motions in advance of the evidentiary hearing, the Blixseth Entities filed one. That motion requested partial summary judgment on two issues:

1) Based on undisputed facts, Lampe took full ownership of the [Collateral WPT Interest] effective April 3, 2012 such that a disposition of the [interest] for the purposes of the U[niform Commercial Code ("UCC")] occurred on April 3, 2012.

2) Based on the facts and circumstances of the disposition, lack of control and marketability discounts are inapplicable to the valuation of the [interest].

Defs.' Mot. (Dkt. # 86) at 2. The court declined to resolve the motion in advance of the evidentiary hearing. Dec. 18, 2013 ord. (Dkt. # 104).

The first of those issues is pivotal. The Blixseth Entities' principal argument as to the "heart of this dispute" is that when Lampe seized the Collateral WPT Interest in April 2012, it effected a "disposition" of that Interest to itself. The court uses "disposition" to mean an acquisition of collateral that requires a secured party to recognize the proceeds of that acquisition and offset the proceeds against the outstanding debts.[1] The only purpose the parties have announced for an evidentiary hearing to determine the value of the Collateral WPT Interest is to determine whether, *assuming Lampe's seizure of the Collateral WPT Interest was a "disposition" to itself*, that "disposition" was worth as much as or more than the Blixseth Entities' debts. The evidentiary hearing, in short, put the proverbial cart before the horse. That approach might have been sensible if it were difficult to determine whether Lampe's seizure of the Collateral WPT Interest was in fact a "disposition." But the "disposition" determination turns on facts that are undisputed, and is thus ripe for summary judgment. Indeed, Lampe might well have resolved that

---

[1] One simple method of "disposition" of collateral is to sell it to a third party, in which case the sales price is the proceeds of the "disposition." Where a party effects a "disposition" of collateral to itself, there is no sales price, and the parties must use another method to determine the proceeds of the "disposition."

ORDER – 5

issue on a motion to dismiss. As a matter of law, Lampe has not yet effected a "disposition" of the WPT interest. The court will explain that conclusion shortly.

Because there has been no "disposition" of the Collateral WPT Interest, the determination that the parties requested at the evidentiary hearing would appear to be irrelevant. The value of the Collateral WPT Interest in the abstract means nothing, or at least it has no meaning that the parties have explained. When Lampe finally effects a "disposition" of the Collateral WPT Interest, it will realize the proceeds of that "disposition." It is the amount of those proceeds, not an abstract determination of "value," that will determine to what extent the Blixseth Entities' debts have been diminished. For that reason, the court is puzzled, to say the least, that the Prim Entities have not proffered a commercially reasonable method to effect a "disposition" of the Collateral WPT Interest. Giving the parties the benefit of the court's substantial doubts, the court will nonetheless decide the value of the Collateral WPT Interest. Perhaps that determination will be, as the parties have promised, useful in a mediation. Regardless, the court suspects that it has allowed the parties to lead it toward setting aside two-and-a-half days of court time to resolve an issue that will have little impact on the resolution of this multi-faceted litigation.[2]

With that context in mind, the court now explains its determinations as to whether Lampe has effected a "disposition" of the Collateral WPT Interest and the fair market value of that Interest.

### III. DETERMINATIONS

**A. Lampe Has Not Yet Effected a "Disposition" of the Collateral WPT Interest.**

In deciding whether Lampe has effected a "disposition" of the Collateral WPT Interest, the court applies summary judgment standards. The parties briefed that question

---

[2] The Prim Entities objected repeatedly to the court's announcement at the beginning of the evidentiary hearing that it would decide whether a "disposition" of the Collateral WPT Interest had occurred. They offered no explanation for why the court should delay that determination, particularly where they had already briefed their position in response to the Blixseth Entities' summary judgment motion.

ORDER – 6

in connection with the Blixseth Entities' motion for partial summary judgment. The court initially considered the possibility that it would need to resolve factual disputes at the evidentiary hearing to resolve the question. The court now concludes that the facts material to deciding whether a "disposition" has occurred are not in dispute, and that the Prim Entities are entitled to judgment as a matter of law.[3]

### 1. Lampe Has Effected No "Disposition" of the Collateral WPT Interest that Complies With the UCC.

The MPA provides that upon default, Lampe may "exercise each and all of the remedies granted to [Lampe] by the Uniform Commercial Code, together with any other remedies which may be available to [Lampe] at law or in equity." MPA, ¶ 3.[4] The MPA is silent as to which state's version of the UCC applies, but no one disputes Lampe's assertion that Nevada law applies. No party has pointed to any difference between any states' codifications of the UCC that is material to this suit. Part 6 of Article 9 of the UCC governs both default and post-default remedies in secured transactions. NRS 104.9601-104.9628.

The UCC provision that addresses "Disposition of collateral after default" allows a secured party to "sell, lease, license, or otherwise dispose of any or all of the collateral . . . ." NRS 104.9610(1). The UCC expressly provides three methods for the secured party to effect a "disposition" of collateral to itself. It may purchase the collateral at a public sale or, provided it meets certain conditions, purchase the collateral at a private sale. NRS 104.9610(3). Alternatively, it may "accept collateral in full or partial satisfaction of the obligation it secures," but only if it meets a series of conditions. NRS 104.9620(1). The latter procedure is referred to as a "strict foreclosure." *E.g.*, *In re*

---

[3] The Prim Entities did not move for summary judgment as to whether a "disposition" had occurred, but the court's announcement at the outset of the evidentiary hearing that it would decide that issue sufficed to give the Blixseth Entities notice of the possibility of "summary judgment for a nonmovant" in accordance with Fed. R. Civ. P. 56(f).

[4] Each document that the court cites in this order was introduced into evidence at the evidentiary hearing.

ORDER – 7

*Schwalb*, 347 B.R. 726, 748 (Bankr. D. Nev. 2006). First among the conditions of a strict foreclosure is that the debtor must consent to the secured party's acceptance of collateral, NRS 104.9620(1)(a), and must do so either in a "record authenticated after default," NRS 104.9620(3)(a) or by remaining silent for at least 20 days after receiving the secured party's proposal to accept the collateral in full satisfaction of the debt, NRS 104.9620(3)(b).

As a matter of law, Lampe did not follow any path charted in the UCC to effect a "disposition" of the Collateral WPT Interest to itself. It has not conducted a public sale of the Collateral WPT Interest. It has not conducted a private sale, nor could it. NRS 104.9610(3)(b) (permitting a secured party to acquire collateral at a private sale "only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations"). There is no evidence that Lampe attempted to take advantage of the strict foreclosure provisions of NRS 104.9620, but even if it had, the Blixseth Entities rejected a strict foreclosure in an April 2, 2012 letter from an attorney for Mr. Blixseth and Desert Ranch. Responding to Lampe's March 26, 2012 notice of default, the attorney wrote that "to the extent that your letter . . . was intended to be a strict foreclosure proposal as contemplated in Uniform Commercial Code 9-620 (Revised Article 9), Mr. Blixseth and Desert Ranch LLP hereby notify 395 Lampe that they do not consent to such a proposal."

The Blixseth entities suggest that although the UCC does not expressly describe any method other than public sale, private sale, or strict foreclosure for a secured party to effect a "disposition" of collateral to itself, it does not prohibit other methods. That is probably incorrect. The UCC prohibits parties from reaching agreements that provide a debtor with fewer rights than the strict foreclosure procedures. NRS 104.9602(10) (prohibiting debtor from waiving protections of NRS 104.9620). It seems unlikely, then, that the UCC grants tacit permission for a secured party to take other routes (beyond a public or private sale) to effect a "disposition" of collateral to itself. The Blixseth

ORDER – 8

Entities cite no authority acknowledging another UCC-compliant pathway to effecting a "disposition" of collateral to a secured party, and the court is aware of none. But even if there are other methods of effecting a "disposition" of collateral directly to the secured party, Lampe did not use one of them.

### 2. Lampe Has Effected No "Disposition" of the Collateral WPT Interest that Does Not Comply With the UCC.

The Blixseth Entities contend that Lampe effected a "disposition" of the collateral to itself even if it did not comply with the UCC in doing so. They note that the UCC provides a range of remedies for debtors against secured parties who violate the UCC in disposing of collateral. NRS 104.9625. Nevertheless, the Blixseth Entities must present some evidence that Lampe effected a "disposition" of the Collateral WPT Interest, whether or not that "disposition" complied with the UCC. They have not.

The Blixseth entities contend that the WPT Consent Minutes executed contemporaneously with the MPA permit Lampe to seize the Collateral WPT Interest *only* in full or partial satisfaction of the debt the MPA secures. That argument depends on a misreading of the Consent Minutes. The Consent Minutes have two substantive paragraphs. The first is a paragraph memorializing the WPT members' consent to the MPA. The second paragraph begins as follows:

> RESOLVED, that it is currently understood by all Members that should Member Timothy L. Blixseth's 1/3 ownership interest in the Company, memorialized by Unit Certificate No. 3 be sold or otherwise transferred pursuant to the above referenced [MPA], the Uniform Commercial Code (or functional state equivalent) and/or any other applicable laws, in full or partial satisfaction of the obligations set forth in the [MPA], that a new individual or entity will become a full Member of [WPT].

That provision is not a requirement that any sale or transfer of the Collateral WPT Interest be in full or partial satisfaction of debt, it is a statement that *if* the Collateral WPT Interest is transferred in full or partial satisfaction of debt, the transferee will become a member of WPT. The next two sentences amplify that plain meaning. The first of them provides that if a Prim Entity becomes the new member in accordance with the first

ORDER – 9

sentence, that entity will automatically become "a full Member with all rights appurtenant thereto." The following sentence provides that a transfer to any other entity "in full or partial satisfaction of the obligations set forth in the MPA" is a permitted transfer within the meaning of Article 11 of the WPT operating agreement. The Consent Minutes do not mandate that every transfer of the Collateral WPT Interest must be in full or partial satisfaction of any debt, they merely state consequences in the event that such a transfer occurs.

The Blixseth Entities achieve no more success in their argument that Lampe's assumption of full ownership of the Collateral WPT Interest is proof that it effected a "disposition" of the Interest to itself. For reasons not apparent to the court, Lampe contests that it acquired full ownership, asserting that it acquired merely legal title to the Collateral WPT Interest, as opposed to beneficial ownership. Lampe is almost certainly mistaken,[5] but it makes no difference. Nothing in the UCC or any other source of authority declares that a secured party who seizes full ownership of collateral has effected a "disposition" of the collateral to itself. The UCC expressly permits a secured party to take possession of collateral. NRS 104.9610. It also permits a secured party to transfer "all rights of the debtor in the collateral," NRS 104.9619(2), and declares that a "transfer of the record or legal title to collateral to a secured party under subsection 2 or otherwise is not itself a disposition of collateral under this article . . . ," NRS 104.9619(3). The UCC thus either expressly permits a secured party to take full ownership of collateral ("record or legal title") without effecting a "disposition," or, at a minimum, it does not prohibit a secured party from doing so.

---

[5] In its April 6, 2012 letter to the Blixseth Entities, Lampe announced that it had seized the Collateral WPT Interest via the MPA and that "[a]s of this date, neither Mr. Blixseth nor Desert Ranch has any interest in WPT." Lampe does not explain how it avoided taking beneficial ownership of the Collateral WPT Interest while extinguishing the Blixseth Entities' ownership entirely. It also does not explain how exercising its right under the MPA to claim all income from the Collateral WPT Interest is consistent with beneficial ownership vested in anyone other than Lampe. Finally, WPT's 2012 tax returns and a regulatory filing with the Oregon Secretary of State declare that it, not a Blixseth Entity or anyone else, is the owner of the Collateral WPT Interest.

ORDER – 10

For all of these reasons, the court concludes that as a matter of law, Lampe has not effected a "disposition" of the Collateral WPT Interest to itself. The court suggests no opinion on whether Lampe's actions to date have been commercially reasonable.

**B.     Assuming It is Relevant, the Fair Market Value of the Collateral WPT Interest is $12.013 Million.**

Having concluded that Lampe has not yet effected a "disposition" of the Collateral WPT Interest to itself, the court has no idea why the value of the Collateral WPT Interest is relevant. Lampe's obligation, an obligation it has avoided for nearly two years, is to effect a "disposition" of the Collateral WPT Interest. Whether it sells the Interest to a third party or acquires the Interest for itself, it is the proceeds of that sale or acquisition that will determine to what extent the Blixseth Entities' debt has been reduced. The abstract "value" of that interest is irrelevant, or at least the parties have articulated no argument for its relevance. The court considers the value of the Collateral WPT Interest only because the parties put themselves through the expense of an evidentiary hearing and convinced the court to divert resources from the remainder of its docket to conduct that hearing. Straining to give the parties the benefit of substantial doubts, the court answers the question on which the evidentiary hearing focused.

The fair market value of the Collateral WPT Interest is $12.013 million. The court uses the term "fair market value" as the parties used it, to denote the price at which the Collateral WPT Interest would sell in a hypothetical transaction between a willing buyer and a willing seller. Fair market value is a standard that deliberately does not consider the characteristics of either the buyer or the seller. Without regard to those characteristics, there is no dispute among the parties that the fair market value of the Collateral WPT Interest is one-third of the value of WPT's assets, reduced to account for both the limited market for interests in closely held corporations (the "marketability discount") and for the disadvantages inherent in owning a non-controlling stake in a closely held corporation (the "lack of control" discount).

ORDER – 11

### 1. The WPT Timberland is Worth $73.5 Million.

As to the value of the WPT's timberland assets, the court adopts the $73.5 million appraisal from the August 24, 2012 report of Richard Tedder and Dr. Phillip Lamont (the "Lamont/Tedder Report"). The court could scarcely reach another conclusion. Mr. Tedder and Dr. Lamont are experts with years of experience in the valuation of timberland. They appraised the WPT timberlands at Lampe's request, following Lampe's instructions to value the property as of April 2012. Their report is a painstakingly detailed account of their appraisal process, and they amplified many of those details in their testimony at the evidentiary hearing. The Blixseth Entities, by contrast, did not submit an admissible appraisal or independent expert testimony of their own.[6] They instead relied on cross-examination of Mr. Tedder and Dr. Lamont along with Mr. Blixseth's testimony about his assessment of the value of the WPT Timberlands. That approach fell well short of undermining the Lamont/Tedder Report.

Briefly, the appraisers concluded that because of its location, the WPT timberland's value as productive timberland greatly exceeded its value for any other purpose, including its value for real estate development. They considered two different approaches to valuing the timberland: a comparable sales approach and an income approach. They rejected the comparable sales approach because they found, using statistical analysis, that the prices for sales of comparable timberland varied too widely to be a reliable predictor. Focusing on the income approach, they used industry standard techniques to estimate the income that the WPT timberlands would generate over 50 years (the approximate time a tree in Idaho or eastern Washington takes to reach merchantable maturity), then discounted that income stream to present value. The

---

[6] The court ruled in its December 18, 2013 order that the Blixseth Entities had not timely disclosed any expert testimony other than a brief report from Douglas McDaniel. Dkt. # 104. At the evidentiary hearing, the court sustained objections to their efforts to introduce expert testimony from Steven Prochnau, who had appraised portions of the WPT timberlands at WPT's request.

ORDER – 12

income estimate used historical data to predict log prices over the next ten years, holding them constant thereafter.

The Blixseth Entities' attempts to poke holes in the Lamont/Tedder Report were not persuasive. They noted that the price at which WPT had acquired its timberlands was nearly twice as high as the Lamont/Tedder appraisal. But they presented no evidence that past acquisition costs would likely influence an open-market buyer. Dr. Tedder explained that comparable timberland sales (one of which was the sale by which WPT acquired a large portion of its timberlands) varied too widely to be reliable. The Blixseth Entities had no persuasive response.

The Blixseth Entities also attempted to argue that because WPT was essentially free of debt (and thus not obligated to earn income to service debt), it had flexibility to harvest timber at a higher or lower rate each year to take advantage of market fluctuations. Dr. Tedder persuasively rejected the notion that a timber company using this approach could reliably, in the long term, achieve better income than the constant yearly harvest that his model assumes.

Mr. Blixseth offered testimony that WPT could earn more money by selling off its timberlands in smaller parcels, both in land swaps with the United States Forest Service and by selling parcels for private development. Mr. Blixseth is permitted to offer opinion testimony about the value of property he once owned, but his testimony did little to overcome the bias inherent in it. The court found Mr. Blixseth's testimony almost entirely speculative. Perhaps an investor could succeed using Mr. Blixseth's approach to the WPT timberland, but the court is convinced on a more-probable-than-not basis that Dr. Tedder's income valuation is a more reliable indicator of fair market value.

> **2. Discounting to Account for Marketability and Lack of Control, the Collateral WPT Interest Had a Fair Market Value of $12.013 Million in April 2012.**

Michelle Salazar, an accountant and appraiser with years of experience, concluded that it was appropriate to apply a marketability discount of 40% to the value of WPT's

ORDER – 13

assets[7] and a cumulative 22% discount for lack of control. One third of the resulting figure is $12.013 million.

The Blixseth Entities barely attempted to undermine Ms. Salazar's determination of the magnitude of the lack of control and marketability discounts; they focused almost entirely on their contention that it was inappropriate to apply those discounts at all. They contended that because the Prim Entities control Kingsbury and the Collateral WPT Interest, they effectively control two thirds of WPT, an interest that is sufficient to control the company. They contend that the Prim Entities would not relinquish that controlling interest by selling the Collateral WPT Interest on the open market. For that reason, they contend, there is no reason to consider either marketability or a lack of control discount. In their view, the Prim Entities will realize not only an additional third of WPT's value by acquiring the Collateral WPT Interest, but a premium to reflect the increase in the value of the Kingsbury interest accruing to its new status as half of a controlling block.

There are at least two reasons that the Blixseth Entities' attempts to avoid the marketability and lack of control discount are not persuasive. First, they offer only speculation, not evidence, that the Prim Entities are in fact interested in exercising control of WPT. There is no evidence that the Prim Entities have done anything to exercise control in the nearly two years since they acquired the WPT Interest. It is not unreasonable to guess that the Prim Entities might be interested in assuming control and the benefits that come with it, but it is also not unreasonable to guess that the Prim Entities have reasons to avoid acquiring control. They may wish to obtain liquid capital. They may believe that the Lamont/Tedder appraisal sharply overvalues WPT. They may have reached an agreement with Voyager to preserve WPT as a company in which no member has control. These are all wild guesses, but no less so than the guesses that the Blixseth Entities offer.

---

[7] To determine the value of WPT's assets, Ms. Salazar used the $73.5 million appraisal from the Lamont/Tedder Report, adjusted upward by about $3.5 million to account for operating and non-operating assets beyond the scope of the Lamont/Tedder report.

ORDER – 14

Second, even if the Blixseth Entities have guessed correctly, and the Prim Entities are interested in keeping control of WPT, they are entitled to do so by putting the Collateral WPT Interest on the market. That is a risky proposition. In the best case for them, no buyer would be willing to pay much, allowing the Prim Entities to gain control at a bargain price. In a less favorable case, a buyer would be willing to pay as much as the value that Ms. Salazar assessed, in which case the Prim Entities could acquire control at a price that reflects a lack of control. There is also the risk, though, that an open market buyer would be willing to pay a much higher price for the WPT Collateral Interest, either because it believes that WPT is worth more than the Lamont/Tedder Report suggests, or because it believes that it can eventually sell its interest to either a Prim Entity or Voyager, who will value it as a controlling block. If they wished to avoid these uncertainties, the Prim Entities might forego their right to sell on the open market and instead attempt to reach agreement with the Blixseth Entities on a strict foreclosure. The parties offered no evidence that makes one of these possibilities more or less likely than the other. The only certainty is that Prim has the option to place the interest on the open market.[8] For that reason, the best measure of value (although far from a perfect one) is the fair market value that Ms. Salazar assessed.

## IV. ORDER

The court has attempted to let the parties guide the resolution of this case. If the evidentiary hearing is any indication, the parties are much less interested in resolving this matter efficiently than the court is.

The parties jointly represented to the court that a determination of the value of the WPT Interest would play a major role in bringing this case to a resolution. The court

---

[8] The Blixseth Entities repeatedly draw the court's attention to *Robblee v. Robblee*, 841 P.2d 1289 (Wash. Ct. App. 1992). There, the court determined that fair market value was an inappropriate measure of value in the sale of a minority interest in a closely held corporation to the holder of a majority interest. *Id.* at 1295. But to explain the *Robblee* court's conclusion is to demonstrate its inapplicability to this case. There has been no agreement that the Prim Entities will acquire the WPT Interest directly from the Blixseth Entities. Unlike the circumstances in *Robblee*, the Prim Entities have the right to sell the minority interest at issue on the open market.

ORDER – 15

now doubts that representation was accurate. Nonetheless, the court hopes that its determination of the fair market value of the Collateral WPT Interest, along with its determination that Lampe has yet to effect a "disposition" of that Interest, will help the parties reach a resolution.

Should the court's hopes be misplaced, this action will nonetheless reach a complete resolution, and it will do so sooner rather than later. From the court's perspective, Lampe's foot-dragging with respect to effecting a disposition of the Collateral WPT Interest must end. The court is willing to determine a commercially reasonable method to effect a disposition of the Collateral WPT Interest if the parties are unable to agree on one, but the court is aware of no reason to delay that disposition. Indeed, the court is aware of no reason that Lampe has delayed that disposition as long as it has. Once the method of disposition is established, the court is willing to stay this action for a reasonable period to allow the disposition to take place. If additional proceedings are necessary after that disposition (for example, to determine if the disposition has resulted in a surplus or deficiency), the court will conduct them.

With those comments in mind, the parties shall submit a joint statement no later than February 6 regarding their preferences for bringing this case to a resolution. They must be specific, detailing precisely what they will do, when they will do it, and what role they request to court to play. If it is not clear already, the court emphasizes that it is not pleased with either the extent of or the pace of the progress the parties have made so far. The court expects the parties to engage in a concerted effort to *efficiently* bring this action to a complete resolution.

DATED this 21st day of January, 2014.

_Richard A. Jones_
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 16