1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

395 LAMPE, LLC, et al.

       Plaintiffs, Counterclaim
Defendants,

    v.

KAWISH, LLC, et al.,

       Defendants, Counterclaim
Plaintiffs, Third-Party
Plaintiffs,

    v.

WAYNE L. PRIM, et al.,

       Third-Party Defendants.

CASE NO. C12-1503RAJ

ORDER

## I.   INTRODUCTION

This matter comes before the Court on the Prim Entities'[1] Motion for Summary Judgment (Dkt. # 205) and the Blixseth Entities' Motion for Partial Summary Judgment on Commercial Reasonableness (Dkt. # 206).  For the reasons set forth below, the Court **GRANTS** the Prim Entities' Motion and **DENIES** the Blixseth Entities' Motion.

---

[1] This Court has previously used this nomenclature to refer to the Parties.  The Plaintiffs are Defendants 395 Lampe, LLC ("395 Lampe"), the Prim 1988 Revocable Trust (the "Prim Trust"), and the Edgewood Commercial Village, LLC ("Edgewood").  They, along with Third-Party Defendant Wayne L. Prim, comprise the "Prim Entities."  The Defendants are Kawish, LLC ("Kawish"), Timothy L. Blixseth, Jessica Blixseth, and the Desert Ranch, LLLP ("Desert Ranch").  Collectively, this Court refers to them as the Blixseth Entities, though Jessica Blixseth has since been dismissed from this Action. *See* Dkt. # 219.  Unless the name of the precise entity is necessary for understanding the facts or law, the Court generally will refer to the Parties collectively in this fashion throughout this Order.

ORDER – 1

## II.   BACKGROUND

Through various transactions between 2008 and 2010, the Prim Entities loaned approximately $30,000,000.00 to the Blixseth Entities.  The Blixseth Entities ultimately defaulted on those loans, leading to the instant litigation.  Four promissory notes and Mr. Blixseth's personal guarantees of the same are at issue in the current set of Motions:[2]

1. The "Overlook Note" between Overlook Partners, LLC and Mr. Blixseth that was later assigned to 395 Lampe and Mr. Blixseth's personal guaranty of the same.  *See* Dkt. # 205 (Prim Decl.) Exs. 3-4.  The Overlook Note bears a principal amount of $10,000,000.  *See id.* ¶ 7; *see also* Dkt. # 156 (Second Am. Compl. ("SAC")) ¶¶ 19-22; Dkt. # 65 (First Am. Answer ("FAA")) ¶ 1.10.

2. The "Desert Ranch Note" between Desert Ranch and Kingsbury Timber, LLC with a principal amount of $13,035,000.  *See* Dkt. # 205 (Prim Decl.) Ex. 5.  The Desert Ranch Note was personally guaranteed by Mr. Blixseth.  *See id.* Ex. 6.  The Desert Ranch Note was assigned to Edgewood on December December 31, 2009.  *See id.* Ex. 7.

3. "Kawish Note 1" between Kawish and 395 Lampe in the amount of $1,000,000.  *See id.* Ex. 8.  Mr. Blixseth also personally guaranteed Kawish Note 1.  *See id.* Ex. 9.

4. "Kawish Note 2" between Kawish and the Prim Trust in the amount of $500,000.  *See id.* Ex. 10.  Similar to the other notes, Mr. Blixseth personally guaranteed Kawish Note 2.  *See id.* Ex. 11.

No payments have been made on any of these notes or on Mr. Blixseth's guarantees of the notes.  *See* Dkt. # 205 (Prim Decl.) ¶¶ 6, 13, 18, 23.

Two of these notes – the Overlook Note and Kawish Note 1 – were secured by a one-third interest in Western Pacific Timber, LLC (the "Collateral WPT Interest").  *See*

---

[2] Mrs. Blixseth (and the Prim Entities' sole cause of action against her) has since been dismissed from this Action pursuant to the Parties' stipulation.  *See* Dkt. # 219.

ORDER – 2

1    Dkt. # 205 (Prim Decl.) ¶¶ 8, 20; SAC ¶¶ 28-37, 55, Ex. 5; FAA ¶¶ 1.13-1.14, 1.16, 1.24.

2    The Collateral WPT Interest once belonged to the Blixseth Entities, but was subsequently

3    seized by the Prim Entities when the Blixseth Entities defaulted on those loans.  The Prim

4    Entities have since sold the Collateral WPT Interest.  *See* Dkt. # 196.  Specifically, 395

5    Lampe retained Realty Marketing/Northwest ("RM/NW") to market and sell the interest.

6    *See id.* at 2.  To do so, RM/NW initiated a public marketing campaign which included

7    newspaper ads and direct marketing to 150 targeted prospects from its database.  *See* Dkt.

8    # 196-1 at 3.  48 catalogs were mailed to prospects who requested them.  *See id.*  At least

9    15 prospective bidders signed the nondisclosure and confidentiality agreements allowing

10   them access to the data room.  *See id.*  And on March 19, 2015, 395 Lampe purchased the

11   Collateral WPT Interest with a credit bid of $12,013,000.00.  *See* Dkt. # 196 at 2; Dkt. #

12   209-1 (Prim Decl.) at 3.  It was the only prospective bidder to submit a bid.  *See id.*

### III.    LEGAL STANDARD

14           Summary judgment is appropriate if there is no genuine dispute as to any material

15   fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

16   56(a).  The moving party bears the initial burden of demonstrating the absence of a

17   genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

18   Where the moving party will have the burden of proof at trial, it must affirmatively

19   demonstrate that no reasonable trier of fact could find other than for the moving party.

20   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

21   the nonmoving party will bear the burden of proof at trial, the moving party can prevail

22   merely by pointing out to the district court that there is an absence of evidence to support

23   the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets

24   the initial burden, the opposing party must set forth specific facts showing that there is a

25   genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

26   *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

ORDER – 3

1    favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

2    *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

3                                 **IV.    ANALYSIS**

4          The Blixseth Entities do not seriously dispute the formation, validity, or

5    enforceability of the Notes.  *See* Dkt. # 212 at 8 ("As with the other obligations, the

6    Blixseth Entities do not contest the formation of the obligation"), 19 ("while we think the

7    Court can make findings as to the enforceability of the various loan agreements involved

8    here . . . .").  Instead, the Blixseth Entities raise several issues separately concerning

9    regarding the four Notes and the corresponding guarantees.  The Court addresses each in

10   turn.

11        a.   The Prim Entities' Fourth Cause of Action: the Overlook Note and Kawish
             Note 1 Guarantees and the Commercial Reasonableness of the Disposition of
12           the Collateral WPT Interest

13        Much of the remaining dispute centers on the Prim Entities' ultimate sale of the

14   Collateral WPT Interest.  The Blixseth Entities argue that the March 19, 2015 auction and

15   sale of the Collateral WPT Interest was not commercially reasonable under the Uniform

16   Commercial Code ("UCC") (*see* Dkt. # 206) while the Prim Entities unsurprisingly

17   contend that the disposition was commercially reasonable (*see* Dkt. # 209).  The Parties

18   appear to stipulate to application of Nevada law as they all cite Nev. Rev. Stat. §

19   104.9610 as the starting point for this analysis.  *See* Dkt. # 206 at 8 n.1; Dkt. # 209 at 7.

20   The Court will do the same, though the Overlook Note provides for Washington law.[3]

21   *See* Dkt. # 205 (Prim Decl.) Ex. 3 at 3.

22        Nev. Rev. Stat. § 104.9610(2) provides that "[e]very aspect of a disposition of

23   collateral, including the method, manner, time, place and other terms, must be

24   commercially reasonable."  Thus, so long as the disposition is "commercially reasonable,

25   a secured party may dispose of collateral by public or private proceedings, by one or

26   more contracts, as a unit or in parcels, and at any time and place and on any terms."  *Id.*

27   _____
     [3] In any event, Nev. Rev. Stat. § 104.9610 and Wash. Rev. Code § 62A.9A-610 are identical.
28   ORDER – 4

1  "The conditions of a commercially reasonable sale should reflect a calculated effort to

2  promote a sales price that is equitable to both the debtor and the secured creditor."

3  *Dennison v. Allen Grp. Leasing Corp.*, 871 P.2d 288, 291 (Nev. 1994) (citing *Savage*

4  *Constr., Inc. v. Challenge-Cook Bros., Inc.*, 714 P.2d 573, 575 (Nev. 1986)).

5          In determining whether a disposition of collateral was commercially reasonable,

6  the mere fact "that a greater amount could have been obtained by a . . . disposition . . . at

7  a different time or in a different method from that selected" is insufficient "to preclude

8  the secured party from establishing that the . . . disposition . . . was made in a

9  commercially reasonable manner."  Nev. Rev. Stat. § 104.9627(1); Wash. Rev. Code §

10  62A.9A-627(a).  A disposition of collateral is commercially reasonable if it "is made: (a)

11  In the usual manner on any recognized market; (b) At the price current in any recognized

12  market at the time of the disposition; or (c) Otherwise in conformity with reasonable

13  commercial practices among dealers in the type of property that was the subject of the

14  disposition."  *Id.* § 104.9627(2); Wash. Rev. Code § 62A.9A-627(b).  The burden of

15  proving commercial reasonableness is on the secured party.  *See Harley-Davidson Credit*

16  *Corp. v. Galvin*, 807 F.3d 407, 412 (1st Cir. 2015) (applying Nevada law); *Peoples Bank*

17  *v. Bluewater Cruising LLC*, No. C12-00939RSL, 2014 WL 202105, at *7 (W.D. Wash.

18  Jan. 17, 2014) (citing *Sec. State Bank v. Burk*, 995 P.2d 1272, 1277 (Wash. Ct. App.

19  2000)).

20          A secured party's failure to conduct a commercially reasonable sale does not

21  categorically waive that party's right to collect a deficiency judgment Nevada and

22  Washington.  *See Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 920 (Nev. 1977);

23  *Rotta v. Early Indus. Corp.*, 733 P.2d 576, 579 (Wash. Ct. App. 1987) (citing *Grant Cty.*

24  *Tractor Co. v. Nuss*, 496 P.2d 966, 970 (Wash. Ct. App. 1972)); *see also* Nev. Rev. Stat.

25  § 104.9620 cmt. 5; Wash. Rev. Code § 62A.9A-620 cmt. 5.  Instead, a secured party who

26  conducts a commercially unreasonable sale faces a rebuttable presumption that the value

27  of the collateral was at least equal to the amount of the outstanding debt.  *See Levers*, 560

28  ORDER – 5

P.2d at 920 (citing *Clark Leasing Corp. v. White Sands Forest Prod., Inc.*, 535 P.2d 1077, 1082 (N.M. 1975); *Universal C.I.T. Credit Co. v. Rone*, 453 S.W.2d 37, 39 (Ark. 1970)); *McChord Credit Union v. Parrish,* 809 P.2d 759, 762 (Wash. Ct. App. 1991) (citing *Empire South, Inc. v. Repp,* 756 P.2d 745, 750 (Wash. Ct. App. 1988)).

There are two essential disputes regarding the commercial reasonableness of the disposition:[4] (1) the manner of the Prim Entities' disposition, and (2) whether the Prim Entities unreasonably delayed the disposition.

### i.    *Whether the Credit Bid Was Commercially Reasonable*

The Blixseth Entities begin by contending that the disposition was not commercially reasonable because the Prim Entities were able to obtain a "control block" of WPT in an auction where they were able to use a credit bid.  *See* Dkt. # 206 at 9-12. To this end, the Blixseth Entities begin with the rather unremarkable proposition that the parties to a secured transaction may agree in advance to what will be a commercially reasonable disposition of collateral so long as the agreed-upon standard is not manifestly unreasonable.  There is little dispute about this point – and the UCC expressly provides for parties to an agreement to agree to reasonable standards for disposition.  *See* Nev. Rev. Stat. § 104.9603(1); Wash. Rev. Stat. 62A.9A-603(a); *see also In re Adobe Trucking*, 551 F. App'x 167, 171 (5th Cir. 2014).

But the Blixseth Entities go further and argue that the Court has already held that the manner of disposition here was commercially unreasonable.  *See* Dkt. # 206 at 9-12. Indeed, it appears that the Blixseth Entities contend that the WPT Consent Minutes dated April 4, 2008 expressly deemed *all* transfers to non-Prim Entities (or perhaps all transfers that did not expressly place a value on the transfer of control) commercially unreasonable.

The Court previously denied the Prim Entities' request for the Court to approve the auction sale pursuant to Nev. Rev. Stat. § 104.9627(3)(a) because a third party,

---

[4] Mr. Blixseth can assert this defense as guarantor.  *See Sec. State Bank*, 995 P.2d at 1276.

ORDER – 6

Keewaydin Holdings, LLC ("Keewaydin"), intervened and actively asserted that it would not approve any sale of the Collateral WPT Interest to a non-Prim Entity.[5]  *See* Dkt. # 155 at 6-11.  That concern has since disappeared – the Prim Entities and Keewaydin stipulated to dismissal of Keewaydin's claims with prejudice in December 2014.  *See* Dkt. # 189.  Furthermore, the Court did not categorically hold that the public auction ultimately adopted by the Prim Entities was commercially unreasonable.  In fact, the Court explicitly reserved its decision "until the parties properly position[ed] it for adjudication."  *See* Dkt. # 155 at 10.

In truth, the issue is a red herring.  Neither the Consent Minutes nor the WPT Operating Agreement actually served as a hurdle to the Prim Entities' ultimate disposition of the Collateral WPT Interest.  Even Keewaydin recognized that the Consent Minutes only: "(1) [] allowed Mr. Blixseth to pledge his interest as security for a loan from Lampe; and (2) [] indicated that if Lampe then attempted to transfer the [Collateral WPT Interest] to any other Prim Entity, that transfer would be deemed "pre-approved" under the WPT Operating Agreement."  *See* Dkt. # 131 at 5.  As such, the Consent Minutes did not prohibit a transfer to a non-Prim Entity and certainly did not establish UCC standards for a sale of the Collateral WPT Interest.  Keewaydin appears to have ultimately consented to a disposition of the Collateral WPT Interest.  *See* Dkt. # 160 (Intervenor Compl.) ¶ 14; Dkt. # 189 (dismissing declaratory action claim *with prejudice*).  Given this apparent resolution, the Court need not further explore whether the Consent Minutes governed the standard of commercial reasonableness – it did not affect the disposition at all.

With respect to the Prim Entities' participation, it is enough to say that the Collateral WPT Interest was disposed of at a *public* auction.  *See* Dkt. # 196.  The UCC as adopted in both Nevada and Washington provides that "[a] secured party may

---

[5] The Court was also concerned that none of the Parties had provided it with evidence of the current value of the Collateral WPT Interest.  *See* Dkt. # 155 at 7.

ORDER – 7

purchase collateral: (a) at a public sale."[6]  Nev. Rev. Stat. § 104.9610(3)(a); Wash. Rev.

Code § 62A.9A-610(c)(1); *see also Savage Constr.*, 714 P.2d at 575-76 (holding that a

secured creditor was permitted to purchase collateral for itself following repossession).

In other words, the Prim Entities' statutorily permitted participation in the public sale did

not render the disposition commercially unreasonable.

The Blixseth Entities also insist that the Prim Entities' ability to use a credit bid[7]

was commercially unreasonable.  But that proposition is not clear.  Numerous other

courts have found that a secured party's acquisition of a repossessed asset with a credit

bid was in compliance with the UCC.  *See e.g., Sky Techs. LLC v. SAP AG*, 576 F.3d

1374, 1378, 1380-81 (Fed. Cir. 2009) (holding that secured party properly foreclosed

upon and ultimately purchased patent rights in conformity with the Massachusetts UCC

where it made a credit bid in a public sale of those rights); *In re Adobe Trucking, Inc.*,

551 F. App'x at 174 (affirming district court and bankruptcy courts finding that sale was

commercially reasonable where secured creditor used a $41 million credit bid at a public

sale to purchase collateral asserted to be worth $81 million); *see also Textron Fin. Corp.

v. Vacation Charters, Ltd.*, No. 3:11-CV-1957, 2012 WL 760602, at *5 (M.D. Pa. Mar. 8,

2012) (holding that challenged disposition was commercially reasonable where secured

party purchased collateral with credit bid); *see also* 4 White, Summers, & Hillman,

---

[6] The sale here was a public sale rather than a private disposition.  The auction was publicly
advertised, nearly 200 prospects were solicited or sought additional information, and prospective
bidders were permitted to participate so long as they signed nondisclosure and confidentiality
agreements.  *See* Dkt. # 196-1 Ex. 1 at 2-3; *see also* Dkt. # 128-1 (Rosenthal Decl.) Ex. 1 at 3-4,
8-9.  In other words, the public both received notice and access to the sale – the hallmarks of a
public sale.  *See* Nev. Rev. Stat. § 104.9610 cmt. 7 (explaining that a public disposition is one
where the public has a meaningful opportunity to competitively bid, implying some form of
public notice preceding the sale and permitting access to the sale); Wash. Rev. Code § 62A.9A-
610 cmt. 7; *see also Edgewater Growth Capital Patners LP v. H.I.G. Capital, Inc.*, 68 A.3d 197,
211 (Del. Ch. 2013) (holding that under the Illinois UCC, a sale is classified "as public when
there is some publicity and the ability for potential buyers to make a bid for the assets").

[7] The Blixseth Entities selectively quote *In re Finova Corp.*, 356 B.R. 609, 624 (Bankr. D. Del.
2006) in an effort to distinguish it.  *See* Dkt. # 214 at 7.  But the *Finova* court clearly held that "it
would be overly-formalistic to prohibit credit bidding" in a situation where an agreement
between a secured party and a stalking horse bidder in a public foreclosure sale for the collateral
did not discuss the issue of credit bidding.  *See id.* at 624-25.

ORDER – 8

1    *Uniform Commercial Code* § 34:27 n.2 (6th ed. 2015) ("Nothing in Article 9 deters a

2    secured party from 'credit-bidding' under 9-610, in which the bid offsets the amount

3    owed from the purchase price.").  In other words, absent some evidence that credit

4    bidding was prohibited by agreement or by commercial practices amongst dealers in this

5    type of property, the Court cannot find that the credit bid rendered the sale commercially

6    unreasonable.

7          Still, the Blixseth Entities' insist that *in this context*, permitting credit bidding

8    would be improper because the Prim Entities may have valued the Collateral WPT

9    Interest more than a third party.[8]  *See* Dkt. # 214 at 7.  The argument fails for several

10   reasons.  First, and most simply, the Blixseth Entities do not provide any evidence to

11   support their argument.  Second, the argument does not make sense.  The Prim Entities

12   purchased the Collateral WPT Interest for the minimum bid amount of $12,013,000.  *See*

13   Dkt. # 196 at 2.  That was the same amount as the Court valued the property in April

14   2012 – in other words*, the fair market value of the Collateral WPT Interest *if sold to a

15   third party*.  *See* Dkt. # 117 at 14-15.  That sale price alone would have determined the

16   amount by which the Blixseth Entities' debt would have been reduced, even if the Prim

17   Entities had been excluded from the sale and forced to repurchase the Collateral WPT

18   Interest from the third party.  *See* Nev. Rev. Stat. § 104.9615(1); Wash. Rev. Code §

19   62A.9A-615(a).  In short, the Prim Entities' *subjective valuation* of the Collateral WPT

20   Interest is entirely irrelevant to whether the sale itself was conducted in a commercially

21

22   _____

     [8] The Blixseth Entities again cite *Robblee v. Robblee*, 841 P.2d 1289 (Wash. Ct. App. 1992).  *See*
23   Dkt. # 212 at 12-13.  As this Court has previously noted, *Robblee* is easily distinguishable.  *See*
     Dkt. # 117 at 15 n.8.  The minority shares in *Robblee* were never put on the open market as the
24   Collateral WPT Interest was here.  Instead, the minority shareholder in *Robblee* was obligated to
     sell his minority interest to the majority shareholder (and no one else).  *See Robblee*, 841 P.2d at
25   1290-91.  Moreover, the *Robblee* court was applying dissenters' rights rules from the
     Washington Business Corporations Act, which also do not apply here.  *See id.* at 1294.  The
26   situation here is not "almost exactly the same" – it is almost entirely different.  Dkt. # 212 at 13.
     The Collateral WPT Interest was placed on the open market and had at least 15 prospective
27   bidders.  *See* Dkt. # 196.  If anything, the fact that the Collateral WPT Interest did not attract
     more bids suggests that the Court overvalued, rather than undervalued it (and that the Prim
28   Entities paid more than they otherwise would have).

     ORDER – 9

reasonable manner.[9]   Even if the Prim Entities could have fetched a better price through some other hypothetical sale (and the Blixseth Entities provide no details for such a sale), that alone does not show that the sale was conducted in a commercially unreasonable manner.   *See* Nev. Rev. Stat. § 104.9627(1); Wash. Rev. Code § 62A.9A-627(a); *see also F.D.I.C. v. Moore Pharm., Inc.,* No. 2:12-CV-00067-MMD, 2013 WL 1195636, at \*3 (D. Nev. Mar. 22, 2013) (quoting *Savage Constr.*, 714 P.2d at 574); *Peoples Bank v. Bluewater Cruising LLC*, No. C12-00939RSL, 2014 WL 202105, at \*7 (W.D. Wash. Jan. 17, 2014).

The long and short of this discussion is simply that the Blixseth Entities have not met their burden to show the absence of evidence to support the Prim Entities' case.   To the contrary, the Prim Entities have shown that no reasonable trier could find that the public sale of the Collateral WPT Interest was commercially unreasonable.[10]

Quite simply, a disposition is commercially reasonable if it is "[o]therwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition."   Nev. Rev. Stat. § 104.9627(2)(c); Wash. Rev. Code § 62A.9A-627(b)(3).   The Prim Entities engaged RM/NW, the largest Pacific Northwest based auction-marketing firm of its kind and which had sold over $1.4 billion in real estate at auction, to market and sell the Collateral WPT Interest.   *See* Dkt. # 196. RM/NW publicly advertised the auction in multiple national and regional outlets,

---

[9] Even if the "control block" nature of the Collateral WPT Interest somehow increased the value of the property in the Prim Entities' hands, *it also did so for Keewaydin (or one of its related entities) which decidedly chose not to bid at a sale from which they were not excluded.   See* Dkt. # 196-1 Ex. 1 at 3 (listing 15 prospective bidders, with no entity apparently related to Keewaydin or its member James Dolan).

[10] Because the Court finds that the Blixseth Entities have not created any issue of material fact as to the commercial reasonableness of the disposition, it need not address their speculative arguments as to the value of the Collateral WPT Interests in calculating a surplus.   It is enough to say that the Blixseth Entities bear the burden of proof in showing that the amount of proceeds of the actual disposition is significantly lower than the range of prices that a complying disposition to an unrelated party would have brought.   *See* Nev. Rev. Stat. §§ 104.9615(6), 104.9626(e). The Blixseth Entities have not presented *any* evidence as to the amount of such a disposition, relying almost entirely on speculation as to the underlying assets of WPT.   That is not enough.

ORDER – 10

1   solicited nearly 200 prospective bidders, and signed nondisclosure and confidentiality

2   agreements with 15 such prospects.  *See id.* Ex. 1 at 2-3; Dkt. # 128-1 (Rosenthal Decl.)

3   Ex. 1 at 8-9.  The only evidence presented – by either party – is that this method "is in

4   conformity with reasonable commercial practices among dealers in timber assets and

5   timber property."  *See* Dkt. # 127 (Rosenthal Decl.) ¶ 9.  The Blixseth Entities'

6   arguments have no merit.

            ii.   *Whether the Sale Was Unreasonably Delayed*

7

8          The Blixseth Parties next argue that the Prim Entities unreasonably delayed in

9   effectuating a disposition of the Collateral WPT Interest.  *See* Dkt. # 206 at 12.

10         As both sets of Parties accurately note, "if a secured party does not proceed under

11  Section 9-620 and holds collateral for a long period of time without disposing of it, and if

12  there is no good reason for not making a prompt disposition, the secured party may be

13  determined not to have acted in a 'commercially reasonable' manner."[11]  *See* Nev. Rev.

14  Stat. § 104.9610 cmt. 2; Wash. Rev. Code § 62A.9A-610 cmt. 2.

15         The Prim Entities foreclosed on the Collateral WPT Interest on April 3, 2012.  *See*

16  SAC ¶ 97; *see also* Dkt. # 117 at 1.  However, the Prim Entities did not effectuate a

17  disposition of the Collateral WPT Interest until March 19, 2015.  *See* Dkt. # 196.  In other

18  words, the Prim Entities retained the collateral for nearly three years before finally

19  disposing of it at a public sale.

20

21  ───────────────

22  [11] The Court disagrees with the Blixseth Entities' claimed "consequence of unreasonable delay in
    the disposition of collateral."  *See* Dkt. # 206 at 13.  They argue that "strict foreclosure" is the
    result of an unreasonable delay in the disposition of collateral.  *See id.* at 13-14.  But that
23  position was abrogated by the revisions to Article 9 of the UCC.  *See* Nev. Rev. Stat. § 104.9620
    cmt. 5 ("[A] mere delay in collection or disposition of collateral does not constitute a
24  'constructive' strict foreclosure.  Instead, delay is a factor relating to whether the secured party
    acted in a commercially reasonable manner for purposes of Section 9-607 or 9-610"); Wash.
25  Rev. Code § 62A.9A-620 cmt. 5 (same).  Accordingly, the Court rejects the "majority rule" the
    Blixseth Entities derive from *Millican v. Turner*, 503 So.2d 289 (Miss. 1987), *Service Chevrolet,*
26  *Inc. v. Sparks*, 660 P.2d 760 (Wash. 1983), and *Moran v. Hollman*, 514 P.2d 817 (Alaska 1973).
    There is no evidence that the Prim Entities either consented to acceptance of the Collateral WPT
27  Interest in an authenticated record or sent the Blixseth Entities a proposal.  As such, no
    "constructive" strict foreclosure occurred.
28  ORDER – 11

1    Unsurprisingly, the Blixseth Entities claim that the Prim Entities' retention was

2    unreasonable as a matter of law.  *See* Dkt. # 206 at 14.  The Prim Entities argue that any

3    delay was attributable to various jurisdictional and litigation issues and that the Collateral

4    WPT Interest generated significant profit during this time, less than the default interest

5    that has accrued.  *See* Dkt. # 209 at 11.  They naturally contend that any delay was

6    reasonable.

7    The UCC "does not specify a period within which a secured party must dispose of

8    collateral."  Nev. Rev. Stat. § 104.9610 cmt. 3; Wash. Rev. Code § 62A.9A-610 cmt. 3.

9    Long periods of time may be commercially reasonable if the secured party has good

10   reasons for delaying the disposition, especially when the delay did not result in any

11   prejudice to the debtor or decline in value in the collateral.  *See e.g., In re Crosby*, 176

12   B.R. 189, 196 (B.A.P. 9th Cir. 1994) (eight months retention of collateral was

13   commercially reasonable because there was no prejudice to debtor and no decline in

14   value of collateral); *Interfirst Bank Clifton v. Fernandez*, 844 F.2d 279, 289 (5th Cir.

15   1988) (two years between repossession and sale held to be commercially reasonable).  On

16   the other hand, where the delay caused prejudice to the debtor or a decline in the

17   collateral's value, it may be commercially unreasonable.  *See e.g., Solfanelli v. Corestates*

18   *Bank, N.A.*, 203 F.3d 197, 202 (3d Cir. 2000)[12] (finding delay of 11 months before selling

19   stock unreasonable because the stock could have been sold earlier at times when price

20   would have substantially or completely satisfied the debt); *Matter of Johnson*, 116 B.R.

21   863, 867 (Bankr. M.D. Ga. 1990) (six month delay commercially unreasonable because

22   food collateral lost all value in the interim and equipment was ultimately sold for less

23   than if sold at debtor's store).

24   But the Blixseth Entities do not point to any decline in the value of the collateral –

25   as discussed, *supra*, they do not provide any real evidence of the value of the Collateral

26   _____

27   [12] The Blixseth Entities mischaracterize the holding of *Solfanelli*.  The *Solfanelli* court found that
     the delay was unreasonable because the value of the collateral decreased *not* because it was
     ultimately less than the sum of the debt.  *Solfanelli*, 203 F.3d at 202.

28   ORDER – 12

1  WPT Interest at all.  Instead, the Blixseth Entities focus their entire argument on the "loss

2  in value" attributable to default interest accruing on the notes.  But default interest would

3  have accrued on the notes with or without a disposition – they are expressly provided for

4  in the Overlook Note and Kawish Note 1.  *See* Dkt. # 205 (Prim Decl.) Exs. 3, 8.

5         In fact, the evidence suggests that the Blixseth Entities benefited from the delay in

6  disposition (at least as far as default interest is concerned).  The Collateral WPT Interest

7  generated profits of $1,656,931.84[13] during the period the Prim Entities held the

8  collateral, all of which was credited to reduce the Blixseth Entities' outstanding

9  obligations under Nev. Rev. Stat. § 104.9207(3)(b) or Wash. Rev. Code § 62A.9A-

10  207(c)(2).  *See* Dkt. # 209-1 (Prim Decl.) at 3.  According to the Prim Entities, the total

11  outstanding balance on the debts secured by the Collateral WPT Interest – the Overlook

12  Note, the Kawish Note 1, and the Blixseth Note II[14] –was $24,932,000.00 as of April 3,

13  2012 and $31,927,449.61 as of March 19, 2015.  *See id.*  Pursuant to their calculations,

14  after applying the $12,013,000.00 received in the disposition, and after applying the

15  respective collection costs and the earned profits, the outstanding balance on these three

16  notes would have been $20,198,226.28 as of March 19, 2015 if the Collateral WPT

17  Interest was sold on April 3, 2012 but was $19,914,449.61 using the actual method.  *See*

18  *id.*  The Blixseth Entities do not controvert these calculations.  *See* Dkt. # 214 at 7-8.

19         In short, the Court finds no merit in the Blixseth Entities' claims of prejudice and

20  notes that the Blixseth Entities have not presented any evidence or argument to show a

21  decline in the value of the Collateral WPT Interest.  Given this disconnect, the Court

22  sincerely doubts their claim of commercial unreasonableness.

23

24

25  ───────────────────────
[13] It is not entirely clear why the Blixseth Entities have cited various press releases or public
26  records regarding WPT's activities.  *See* Dkt. # 206 at 6-7.  Whatever the case, those activities
   may have generated the very profits the Blixseth Entities benefited from.

27  [14] The Prim Entities have dismissed their claims on this note without prejudice.  *See* Dkt. # 199;
   Dkt. # 201.
28  ORDER – 13

This is particularly true because a secured party may reasonably delay disposing of collateral if the debtor's actions prolong the disposition. *See e.g., Campbell Leasing, Inc. v. F.D.I.C.*, 901 F.2d 1244, 1250 (5th Cir. 1990) (holding that secured parties reasonably delayed disposing of aircraft where it waited for the debtors to provide maintenance records and flight logs and because debtors "*contributed to prolonging the process* by keeping the [secured parties] in *continuous litigation*") (emphasis added); *Cooper v. First Interstate Bank of Denver, N.A.*, 756 P.2d 1017, 1021 (Colo. App. 1988) (holding that it was commercially reasonable for the secured party to hold stock until liquidation was completed, especially when the debtor requested that the secured party wait); *First Nat'l Bank of Black Hills, Sturgis v. Beug*, 400 N.W.2d 893, 897 (S.D. 1987) (holding that delay of 16 months was commercially reasonable where the debtor "vigorously contested the legality of the repossessions and made numerous motions for return of the collateral" and the parties negotiated during the period in an attempt to resolve the dispute).

In this case, much of the delay in the disposition can be attributed to the Blixseth Parties or to Keewaydin's litigation. To be sure, the Blixseth Parties have not sought an injunction to block the disposition, but they (and Keewaydin) have done just about everything else possible to frustrate the Prim Entities from benefiting from a judicial determination pursuant to Nev. Rev. Stat. § 104.9627(3)(a) or Wash. Rev. Code § 62A.9A-627(c)(1).

This case – and the issue of a commercially reasonable disposition method – was litigated in multiple forums (with competing claims of jurisdiction) for nearly a year before the Parties finally consented to a partial consolidation before this Court in March 2013. *See* Dkt. # 48 at 2-3; Dkt. # 49 (Brain Decl.) Exs. 1-2; Dkt. # 52. Shortly thereafter, in July 2013, the Parties stipulated to a valuation hearing for the Collateral WPT Interest, with roughly four months to conduct discovery. *See* Dkt. # 73 at 3-4. The Court conducted such a hearing in January 2014 (*see* Dkt. # 117) and the Prim Entities quickly filed a request to approve the current disposition method (*see* Dkt. # 125). The

ORDER – 14

1    Court denied the request because Keewaydin intervened (*see* Dkt. # 131; Dkt. # 155 at

2    11), which presumably led to yet more negotiations between the Prim Entities and

3    Keewaydin.  Nevertheless, shortly after the Keewaydin issues had been resolved in

4    December 2014 (*see* Dkt. # 189; Dkt. # 190), the Prim Entities undertook their

5    disposition of the Collateral WPT Interest (*see* Dkt. # 196).  In short, the Prim Entities

6    have provided a clear and legitimate reason for their delay: litigation which frustrated

7    their efforts to preserve their right to a deficiency judgment.

8            The timeliness of the disposition is a closer issue.  Nevertheless, on balance, the

9    Blixseth Entities have failed to show the absence of evidence supporting the Prim

10   Entities' position.  On the other hand, the Prim Entities have shown the absence of a

11   genuine issue of material fact on this point.  Given the relative "color" on title (with

12   Keewaydin's intervention) and uncertainty they faced with collecting a deficiency

13   judgment (due to the Blixseth Entities' litigation) they reasonably chose to resolve as

14   many of these disputes as they could before effectuating a disposition of the Collateral

15   WPT Interest.  Following substantial litigation, the only apparent obstacle to a

16   commercially reasonable disposition was Keewaydin's claims and the Prim Entities

17   quickly disposed of the Collateral WPT Interest soon after those claims were dismissed.

18   *See* Dkt. # 189; Dkt. # 190; Dkt. # 196.  Moreover, the Blixseth Entities make much ado

19   about nothing when they claim "prejudice" resulting from the delay.  Not only was the

20   delay largely attributable to their gamesmanship, but they present no evidence showing

21   that they were prejudiced by any delay in disposition.  If anything, the Blixseth Entities

22   enjoyed the benefit of the profits earned while the matter was pending disposition.

23           In short, the Court finds that the Prim Entities have met their burden in showing

24   that the disposition of the Collateral WPT Interest was commercially reasonable.  The

25   Court further finds that the Blixseth Entities have not shown the absence of evidence

26   supporting the Prim Entities' position – to the contrary, by failing to present sufficient

27   evidence on this point, they have failed to raise a genuine issue of material fact.

28   ORDER – 15

1

        iii.   *The Validity and Enforceability of the Overlook Note and Kawish Note*
               *1 Guarantees*

2          Having resolved the issues pertaining to the commercial reasonableness of the

3   disposition of the Collateral WPT Interest, the Court faces a simple question as to

4   whether the Prim Entities (specifically, 395 Lampe) are entitled to summary judgment on

5   their claim for breach of contract against Mr. Blixseth on his personal guarantee of the

6   Overlook Note and Kawish Note 1.  *See* SAC ¶¶ 125-135.  It does not appear that the

7   Blixseth Entities dispute the validity or enforceability of the guarantees.[15]

8          The elements for a breach of contract claim are essentially the same under Nevada

9   and Washington law.  Those elements are: "(1) the existence of a valid contract; (2) a

10  breach by the defendant; and (3) damages as a result of the breach."  *Cohen-Breen v.*

11  *Gray Television Grp., Inc.*, 661 F. Supp. 2d 1158, 1171 (D. Nev. 2009) (citing *Saini v.*

12  *Int'l Game Tech.,* 434 F. Supp. 2d 913, 919-20 (D. Nev. 2006)); *Newmont USA Ltd. v.*

13  *Am. Home Assur. Co.*, 676 F. Supp. 2d 1146, 1154 (E.D. Wash. 2009).

14         There is little question regarding the existence of a valid contract here.  Mr.

15  Blixseth entered into the Overlook Note Guaranty on May 5, 2008, personally

16  guaranteeing that all obligations on the Overlook Note would be paid.  *See* Dkt. # 205

17  (Prim Decl.) Ex. 4.  Mr. Blixseth entered into the Kawish Note 1 Guaranty on July 20,

18  2009 guaranteeing that all obligations on Kawish Note 1 would be paid.  *See* Dkt. # 205

19  (Prim Decl.) Ex. 9.

20         There is also no question that the contracts have been breached.  To date, neither

21  Overlook Partners nor Kawish has made any payments on their respective notes.  Dkt. #

22  _____
23  [15] Because the Blixseth Entities do not even respond to the Prim Entities' arguments regarding
    Mr. Blixseth's apparent defense that the Parties orally agreed to other terms, the Court need not
24  address that issue.  Still, the evidence shows that the Prim Entities never actually agreed that the
    Overlook Note and Kawish Note 1 would only be enforced by sales of WPT assets.  *See* Dkt. #
25  205 (Sweet Decl.) Ex. 18 [Blixseth Depo. Tr.] at 87:17-88:11.  Furthermore, the parol evidence
    rule "provides that prior negotiations and agreements merge in the written contract, and parol
26  evidence is not admissible to vary or contradict the written agreement's terms."  *Crockett &*
    *Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1191 (D. Nev. 2006)
27  (citing *Tallman v. First Nat'l Bank of Nev.*, 208 P.2d 302, 306 (Nev. 1949)).  As such, the
    Blixseth Entities cannot rely on parol evidence to contradict the clear terms (such as interest
28  rates, maturity dates, and the like) of the notes and guarantees.
    ORDER – 16

205 (Prim Decl.) ¶¶ 6, 18.  Mr. Blixseth has not made any payments on his guarantees. *Id.*

Finally, there is no doubt that Prim Entities – and 395 Lampe in particular – have suffered damages as a result of the breach.  As of September 21, 2015, the outstanding balance on the Overlook Note was $14,637,214.45, consisting of $10,000,000 in principal, $4,076,915.37 in interest, $60,299.08 in outstanding collection costs, and $500,000.00 in outstanding late fees.  *See id.* ¶ 9.  As of the same date, the outstanding balance on Kawish Note 1 was $1,116,417.59, comprised of $1,000,000.00 in principal, $107,013.70 in outstanding interest, and $9,403.89 in outstanding collection costs.  *Id.* ¶¶ 19-21.

Because the Blixseth Entities have not raised a genuine issue of material fact, the Court is inclined to find that the Prim Entities – 395 Lampe specifically – are entitled to judgment as a matter of law and to grant summary judgment in their favor.  However, the Parties have indicated that this claim cannot be entirely adjudicated until the litigation in *Greg LeMond v. Yellowstone Development, LLC, et al.*, Civil Case No. DV-29-2007-5 pending before the Montana Fifth Judicial District Court, Madison County (the "Montana Litigation") is resolved.  *See* Dkt. # 198 at 4.  The Parties have recently indicated that further litigation is required in that case, necessitating more time.  *See* Dkt. # 217.

The Court will **GRANT** summary judgment in favor of the Prim Entities (395 Lampe specifically) on the Prim Entities' fourth cause of action but only as to Mr. Blixseth's liability.  As to the remaining issues of the *amount* Mr. Blixseth owes under his guarantees, the Court permits the Parties to proceed in the fashion they suggest: they are **ORDERED** to submit a joint statement **within fourteen (14) days after entry of judgment in the Montana Litigation** notifying the Court of the result of that litigation. The joint statement must also include the Parties' proposed method of resolving the issues remaining in *this case*.  The Court anticipates that the sole remaining issue will be the amount of Mr. Blixseth's liability on this particular claim.

ORDER – 17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.  <u>The Prim Entities' Fifth Cause of Action: the Desert Ranch Note Guaranty and The Blixseth Entities' Purported Right to a Surplus</u>

Pursuant to the Prim Entities' fifth cause of action, Edgewood is bringing its claim for breach of contract against Mr. Blixseth on his personal guaranty of the Desert Ranch Note.  *See* SAC ¶¶ 136-142.  As discussed, *supra*, the Blixseth Entities do not seriously dispute the validity, formation, or enforceability of the notes or guarantees.  Each of the elements for breach of contract also appears to be met.

Mr. Blixseth entered into the Desert Ranch Note Guaranty on April 1, 2009, personally guaranteeing that all obligations under the Desert Ranch Note would be paid.  *See* Dkt. # 205 (Prim Decl.) Ex. 6.  The Desert Ranch Note was originally between Desert Ranch and Kingsbury Timber, LLC.  *See id.* Ex. 5.  However, Kingsbury Timber, LLC later assigned its rights to Edgewood.  *See id.* Ex. 7.  Neither Desert Ranch nor Mr. Blixseth has ever made any payment on either the Desert Ranch Note or the Desert Ranch Note Guaranty.  *See id.* ¶ 13.  As of September 21, 2015, the outstanding balance on the Desert Ranch Note was $15,343,287.52 consisting of $12,937,746.51 in principal, $2,014,666.03 in outstanding interest, and $390,874.98 in outstanding collection costs.[16]

The Blixseth Entities' opposition is far from clear on this claim.  *See* Dkt. # 212 at 8-9.  As best this Court can tell, the Blixseth Entities' sole defense is that they could have recovered a surplus (which could have been applied to the Desert Ranch Note debt) had the Collateral WPT Interest been sold in a commercially reasonable manner.  *Id.*  The Court has disposed of the commercial reasonableness issue: the Blixseth Entities have not raised a genuine issue of material fact or shown the absence of evidence to support the Prim Entities' position.  Moreover, they have not presented any evidence (and therefore satisfied their burden) in showing the amount of a complying disposition.  *See* Nev. Rev. Stat. §§ 104.615(6), 104.9626(e).

---

[16] Several parcels of real property securing the Desert Ranch Note were sold between June 11, 2009 and August 3, 2015, reducing the principal and accrued interest on the note.  *See* Dkt. # 205 (Prim Decl.) ¶ 15.  There does not appear to be a dispute regarding the commercial reasonableness of those dispositions.

ORDER – 18

The Court finds that the Prim Entities are entitled to summary judgment on this claim.  Specifically, the Court **GRANTS** summary judgment in favor of Edgewood and against Mr. Blixseth in the amount of $15,343,287.52 plus interest and reasonable attorneys' fees that continue to accrue after September 21, 2015.

   c.   The Prim Entities' Sixth Cause of Action: the Kawish Note 2 Guaranty

Pursuant to the Prim Entities' sixth cause of action, the Prim Trust is bringing its claim for breach of contract against Mr. Blixseth on his personal guaranty of the Kawish Note 2 Guaranty.  *See* SAC ¶¶ 143-153.  As discussed, *supra*, the Blixseth Entities do not seriously dispute the validity, formation, or enforceability of the notes or guarantees. Each of the elements for breach of contract also appears to be met.

Mr. Blixseth entered into the Kawish Note 2 Guaranty on November 13, 2009, personally guaranteeing that all obligations under Kawish Note 2 would be paid.  *See* Dkt. # 205 (Prim Decl.) Ex. 11.  Neither Kawish nor Mr. Blixseth has ever made any payment on either Kawish Note 2 or the Kawish Note 2 Guaranty.  *See id.* ¶ 23.  As of September 21, 2015, the outstanding balance on Kawish Note 2 was $1,132,986.45 consisting of $500,000.00 in principal, $594,575.34 in outstanding interest, and $38,411.11 in outstanding collection costs.[17]

The Blixseth Entities argue that Kawish currently has a claim against the Prim Trust in an action pending before the King County Superior Court entitled *Kawish, et al. v. 1988 Prim Revocable Trust, et al.*, Case No. 14-2-18942-7 SEA.  *See* Dkt. # 212 at 4. They appear to argue that they are entitled to a setoff based on any amounts they can recover in that case.  *See id.*  That may be true, but the Court is not convinced that the proper remedy is to remand or stay this action pending resolution or that such an argument is properly presented to this Court.  Moreover, if Kawish is actually successful in obtaining judgment, then the Prim Trust can likely assert any judgment entered in this

---

[17] $45,000.00 was credited against accrued collection costs due to the Bankruptcy Court's requirement of Kawish to make an adequate protection payment to the Prim Trust.  *See* Dkt. # 205 (Prim Decl.) ¶ 25.

ORDER – 19

Action as a set off.  In either case, the Blixseth Entities have failed to provide any basis for this Court to deny summary judgment.

The Court therefore finds that the Prim Entities are entitled to summary judgment on their sixth cause of action.  The Court **GRANTS** summary judgment in favor of the Prim Trust and against Mr. Blixseth in the amount of $1,132,986.45 plus interest and attorneys' fees that continue to accrue after September 21, 2015.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Prim Entities' Motion for Summary Judgment and **DENIES** the Blixseth Entities' Motion for Partial Summary Judgment.  Specifically:

1. Summary judgment is **GRANTED** in favor of 395 Lampe and against Mr. Blixseth on the Prim Entities' Fourth Cause of Action for Mr. Blixseth's breach of the Overlook Note Guaranty and the Kawish note Guaranty.  The Court grants summary judgment *only* as to Mr. Blixseth's liability on those guarantees.  The Court will determine the amount of the liability only after entry of judgment in the Montana Litigation.

2. Summary judgment is **GRANTED** in favor of Edgewood and against Mr. Blixseth on the Prim Entities' Fifth Cause of Action for Mr. Blixseth's breach of the Desert Ranch Note Guaranty.  Summary judgment is granted in favor of Edgewood in the amount of $15,343,287.52 plus interest and reasonable attorneys' fees that continue to accrue after September 21, 2015.

3. Summary judgment is **GRANTED** in favor of the Prim Trust and against Mr. Blixseth on the Prim Entities' Sixth Cause of Action for Mr. Blixseth's breach of the Kawish Note 2 Guaranty.  Summary judgment in favor of the Prim Trust and against Mr. Blixseth in the amount of $1,132,986.45 plus interest and attorneys' fees that continue to accrue after September 21, 2015

ORDER – 20

Because the Montana Litigation remains pending and because the Court is not inclined to enter piecemeal judgments, the Court will not enter judgment at this time. Instead, the Court **ORDERS** the Parties to submit a joint statement **within fourteen (14) days after entry of judgment in the Montana Litigation** notifying the Court of the result of that litigation.  The joint statement must include the Parties' proposed method of resolving the issues remaining in *this case*.  The Court will administratively close this case pending receipt of the joint statement.

DATED this 12th day of April, 2016.

The Honorable Richard A. Jones
United States District Court

ORDER – 21